Receipt # 061299

ECF

ORIGINAL

FILED
AUG 3 0 2004
U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NORTH STAR ALASKA HOUSING CORPORATION,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | ) | 04-1396C |

## COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Plaintiff North Star Alaska Housing Corporation alleges:

### JURISDICTION

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491, *et seq.* and 41 U.S.C. § 601, *et seq.*

### THE PARTIES

2. The plaintiff is North Star Alaska Housing Corporation ("North Star"), an Alaska corporation with its principal offices at 937 Harvard Avenue East, Seattle, Washington 98102.

3. The defendant is the United States of America, acting through officials representing the Secretary of the Army and the Chief of the Army Corps of Engineers (the "Government").

### NATURE OF THE ACTION

4. This is an action for breach of contract arising out of the lease agreement ("Lease," attached hereto as Exhibit A) between North Star and the Government for the 400-unit Army housing complex on Fort Wainwright, Alaska known as Birchwood Homes, which was entered into by virtue of the authority of 10 U.S.C. § 2828, as amended by Section 801 of Public

Law 98-115 ("Section 801"). Section 801 introduced privatization into the military housing market, and represents an effort by Congress to ensure that soldiers and their families receive quality, safe, affordable, and convenient housing options that had been lacking when military housing was exclusively Government-run.

5. As set forth below, the Government has breached its Lease with North Star and has acted in bad faith in administering the Lease.

6. Further, pursuant to 28 U.S.C. § 2201-02, North Star seeks a declaration as to the Government's contractual obligations pursuant to the Lease.

7. Prerequisite jurisdictional matters with respect to the filing of this Complaint and with respect to the claims asserted in this Complaint have been met.

8. For fourteen (14) of the nineteen (19) requests for a Contracting Officer's Decision ("COD") which form the basis of this complaint, the Contracting Officer declined to issue a COD because he contended that the requests implicated the same allegations which are already pending before the Court of Federal Claims in Civil Matter Nos. 98-168, 02-1632C, and 03-2699C.

## BACKGROUND

9. In February 1985, the United States Army Corps of Engineers (hereafter "COE") issued Request for Proposals (hereinafter "RFP") No. DAC85-85-R-0019 for Design and Construction of 400 units of Section 801 Build-to-Lease On-Base Family Housing for Fort Wainwright, Alaska.

10. North Star submitted proposals in a timely manner for the July 5, 1985 deadline for receipt of initial proposals and for the December 16, 1985 deadline for receipt of best and

final offers. The contract was awarded to North Star on December 31, 1985. The contract documents include the following:

(a) Contract No. DACA85-1-86-11, the Outlease of the Government property on Fort Wainwright to North Star for a term of thirty-two (32) years, beginning on June 27, 1986 and ending on June 26, 2018, entered into under the authority of 10 U.S.C. § 2667;

(b) Contract No. DACA85-9-86-27, the Agreement to Lease the same Government property from North Star with residential buildings and other improvements back to the Government, which was effective on June 17, 1986, under the authority of 10 U.S.C. § 2828, as amended by Section 801 of P.L. 98-115;

(c) Contract No. DACA85-87-74, the Interim Lease for the residential units for the period of phased occupancy as the units became ready for habitation until the COE accepted all of the units entered into between COE and North Star on January 24, 1987 and terminating upon execution of the Lease;

(d) Contract No. DACA085-5-88-17, the Lease between COE and North Star for the land and improvements for a term of nineteen (19) years and six (6) months executed on November 6, 1987; and

(e) a Memorandum of Understanding (hereafter "MOU") which sets forth the conditions agreed to by North Star and the COE for acceptance of units during the phased occupancy period which was effective December 22, 1986.

11. Pursuant to the Lease, the COE is renting all 400 units for nineteen years and six months. The COE pays "shelter rent" for the use of the housing. This is an amount determined by North Star and submitted as a part of its price proposal to provide for return on and of the capital investment required for construction. The COE is contracting with North Star for a variety of maintenance and operational services. Payment for these services is called "maintenance rent." The COE is also obligated to pay the rates and charges for utilities used by the Government during the full term of the Lease.

## FACTUAL ALLEGATIONS

### I. The Government Continues to Diminish the Value of North Star's Asset By Refusing to Authorize Necessary Maintenance

12. During the inspections of units 711, 1048, and 813, North Star's site manager and the Government's housing inspector both detected pet stains on the carpet in all rooms of each unit. However, the maintenance memoranda and work authorizations issued by the Government for these units stated "no sealing required."

13. North Star sought a Contracting Officer's Representative's ("COR") determination respecting the necessity of replacement and sealing of carpet in units 711, 1048, and 813. After several inspections, the COR determined that urine was present in unit 813 and sealing would be work authorized; that urine was present in the bedrooms of unit 711 but not elsewhere and sealing of only bedroom floors would be work authorized; and that urine was not present in unit 1048.

14. On October 10, 2003, North Star requested a Contracting Officer's Decision ("COD") on the need for carpet replacement and sealing throughout units 711, 1048, and 813, and on the financial responsibility for those replacements which had not been work authorized.

North Star's request was supported by affidavits of workers who had replaced the urine-damaged carpet.

15. By letter dated November 12, 2003, the contracting officer declined to issue a final decision because he contended that North Star's Request for a COD on the claim respecting Carpet Replacement and Sealing in Units 711, 1048 and 813 implicated the same allegations which are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

16. The Government failed to work authorize replacement of the carpet during change of occupancy of units 717, 613, 1153, and 1254, which contained pet stained carpet throughout.

17. On October 27, 2003, North Star requested a COD on the necessity for replacement of carpet and sealing in all areas of units 717, 613, 1153, and 1254, and on the financial responsibility with respect thereto.

18. By letter dated November 12, 2003, the contracting officer declined to issue a final decision because he contended that North Star's Request for a COD on the claim respecting Carpet Replacement and Sealing in Units 717, 613, 1153, and 1254 implicated the same allegations which are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

19. The toilet tank in occupied unit 1227 leaked fresh potable water onto the carpet, after which the carpet smelled strongly of urine. North Star and the Government agree that prior to the leaking of the toilet tank the carpet was stained with pet urine.

20. The Government directed North Star to replace carpet in the upper hall and stairway of unit 1227 at North Star's expense. Upon information and belief, but for the pet urine damage, the fresh, potable water from the toilet tank would not have caused any foul order, nor would it have warranted carpet replacement and floor sealing.

21. North Star replaced the carpet, and requested reimbursement from the Government for the pet damaged carpet. The Government refused to reimburse North Star.

22. On October 28, 2003, North Star requested a COD regarding the financial responsibility for replacement of pet damaged carpet in unit 1227.

23. By letter dated November 12, 2003, the contracting officer declined to issue a final decision because he contended that North Star's Request for a COD on the claim respecting Unit 1227 Upper Hall and Stairway Carpet Replacement implicated the same allegations which are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

24. The vinyl throughout unit 701 contained holes that appeared to have been caused by high heel shoes. The Government directed replacement of the vinyl at North Star's expense.

25. On October 28, 2003, North Star requested a COD regarding the financial responsibility for vinyl replacement in the downstairs bath, master bath, and dining room of unit 701.

26. By letter dated November 12, 2003, the contracting officer declined to issue a final decision because he contended that North Star's Request for a COD on the claim respecting Vinyl Replacement in Unit 701 implicated the same allegations which are already pending

before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

27. The Government issued a work authorization for unit 1151 (No. 0310-0030) which stated: "Repair wall damage in d/s hall (paint/texture is NSAHC wall prep)," and did not include reimbursement of painting and texturing the occupant-damaged wall.

28. Painting and texturing is not North Star's wall preparation for any painting other than that necessitated by occupant damage, where it is necessary to apply a first coat of paint in order to seal the damaged area in order to allow a matching finish to the remaining wall paint.

29. By letter dated October 28, 2003, North Star requested a COD on whether the cost of the texturing and painting needed to prepare the occupant-damaged walls for painting should be reimbursed to North Star.

30. On December 19, 2003, the contracting officer issued a decision that the Lease requires North Star to be reimbursed for the full amount of time and materials necessary for the completion of the entire task necessitated by occupant damage, but that the Government is not responsible for stated man-hour costs which are not substantiated by the Engineered Performance Standards ("EPS"), such as the painting and texturing wall preparation which North Star performs as part of its repair of occupant-damaged walls.

31. The countertops in units 640 and 1150 sustained occupant damage. The Government issued units 640 and 1150 to North Star for maintenance and repair work without providing a work authorization for replacement of occupant-damaged countertops.

32. North Star requested that the COR inspect the units and provide a determination as to the financial responsibility for replacement of countertops.

33. By letter dated December 12, 2004, the COR stated that he had inspected the units. With respect to unit 604, he stated that the countertops were repaired due to occupant damage in 1997, and that the present condition of the countertops was not due to occupant damage, but to the failure of North Star's repairs. With respect to unit 1150, he stated that a portion of the kitchen countertop had been repaired in the past, and that the repair had failed, but that replacement of the entire countertop was unnecessary if the damaged portion of the kitchen countertop could be replaced to match the adjacent countertops.

34. During past change of occupancies, North Star objected to the Government's order that the occupant-damaged countertops in units 604 and 1150 be repaired rather than replaced. Upon information and belief, the Government deliberately does not order replacement of occupant-damaged items so that during later changes of occupancy, it can place the entire financial burden of replacement on North Star.

35. By letter dated December 22, 2003, North Star requested a contracting officer's decision as to whether the replacements of countertops in units 604 and 1150 are due to occupant damage, and thereby the financial responsibility of the Government.

36. On February 19, 2004, the Government issued a contracting officer's decision that prior repairs performed on the countertops in units 604 and 1150 had failed and that these failures, and thus the cost of replacing the countertops, were North Star's responsibility.

37. On November 20, 2003, the Government's quality assurance inspector conducted its cleaning inspection of unit 952. At the time of his inspection, there was a note on the master bedroom toilet which had been left by the Government's cleaning contractor, stating that there was a problem with the toilet. The Government took no action to correct the problem with the toilet, nor did it notify North Star that any problem existed.

38. Three weeks later unit 952 was issued to North Star for change of occupancy maintenance, by which time the unit had sustained flood damage. The flood damage occurred while unit 952 was in the Government's exclusive possession and control.

39. The Government requested that North Star repair the water damage. By letter dated December 12, 2003 to the action 801 Housing Manager, North Star requested a work authorization to perform the repair work.

40. By letter dated December 23, 2003 to North Star, the COR stated that the Government was investigating the cause of the flood damages. By letter dated January 9, 2004 to North Star, the COR stated that the damages were attributable to an "act of God" and were North Star's responsibility, and that repairs to the unit would be made under Section D.6 of the Lease, pursuant to which rent payments are suspended during restorations of units damage by fire and other occurrences which require unit restoration.

41. By letter dated January 21, 2004, North Star requested a COD on whether the flood damage to unit 952 was attributable to an "act of God" or to the Government's failure to ensure that the unit was properly maintained while it was in its exclusive possession and control, and whether the Government was required to make rental payments to North Star while repairs were conducted on the unit.

42. On March 19, 2004, the contracting officer issued a decision that the water damage to unit 952 was caused by a frozen drain pipe, that the actions taken by the Government were appropriate, that the water to the toilet was turned off at the time of the cleaning inspection, that the problem with the toilet did not require notification to North Star, that North Star should have discovered problems with the toilet as part of its preventative maintenance, and that the damage was North Star's responsibility.

43. The Government ordered replacement of the carpet in unit 863 at North Star's expense. North Star disagreed with this direction, as the carpet required replacement due to occupant damage.

44. By letter dated December 24, 2003, North Star requested a COR's determination regarding the cause of carpet replacement in unit 863 and the financial responsibility with respect thereto.

45. By letter dated December 29, 2003, the COR stated that the carpet and pad replacements on the stairway and landing were at the Government's cost, that the Government would accept 50% responsibility for certain other carpet and pad replacements, and that he would inform the Birchwood Housing Manager of his determination.

46. By letter dated February 13, 2004, North Star wrote to the Birchwood Housing Manager, Connie Kiser, because it had not yet received a new or updated work authorization reflecting the COR's determination that at least some of the carpet replacement in unit 863 was the Government's financial responsibility. By letter dated February 18, 2003, the Birchwood Housing Manager stated that she would seek clarification from the COR.

47. By letter dated February 20, 2004, the COR stated that his December 29, 2003 letter was in error with respect to the Government taking financial responsibility for carpet replacement in the stairway and landing. When the unit was inspected in 1998 and 2000, both North Star and Government inspectors noted occupant damage on the stairway and landing carpet, but the Government did not order replacement of that carpet in those years. Upon information and belief, the Government deliberately does not order replacement of occupant-damaged items so that during later changes of occupancy, it can place the entire financial burden of replacement on North Star.

48. Certain items of the COR's December 29, 2003 letter which have not been repudiated by the COR have also not been work authorized by the Government. These items are: 50% of the frayed living room carpet; bleach-stained upstairs hallway carpet; damaged carpet and pad in bedroom #2, and any Government-ordered replacement in bedroom #3 (since the condition of the carpet itself does not warrant replacement).

49. Other items of the COR's December 29, 2003 letter are inaccurate. The COR contends that the living room carpet is damaged due to "extensive wear" in high traffic areas and that replacement is North Star's responsibility. North Star disagrees that the wear is extensive or that the wear itself warrants replacement. Replacement is required due to occupant-caused frays which appear to be the result of pet digging, and is thus the Government's full financial responsibility. The COR also does not order replacement of bleach-stained stairway carpet, which should be replaced at the Government's full cost.

50. On March 8, 2004, North Star requested a COD on whether the Government must issue a work authorization for replacement of items identified in the COR's December 29, 2003 letter as Government responsibility, and on which party bore financial responsibility for the replacements with which North Star disagrees.

51. On April 29, 2004, the Contracting Officer issued a decision that the Government is required to reimburse North Star for occupant-caused damages, and that such reimbursement had already been accomplished by work authorization. The Contracting Officer also determined that the COR's determinations would stand.

## II. The Government Continues to Wrongfully Reduce North Star's Rent

52. By letter dated November 24, 2003, the Government stated that $31,948.31 would be deducted from North Star's rent for alleged excess downtime for October 2003. North Star

did not receive notification of this deduction until after it occurred. North Star's records do not support the Government's calculation of 329.5 excess downtime days for October 2003.

53. By letter dated December 10, 2003, North Star requested a COD on the propriety of the Government's deduction of $31,948.21 from North Star's rent based on the Government's calculation of October 2003 downtime, including the propriety of the Government's method of calculating the downtime amount.

54. By letter dated February 9, 2004, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the claim respecting Rent Payment Withheld by the Government – October 2003 Rent Abatement implicated the same allegations which are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

55. By letter dated January 23, 2004, the COR informed North Star that $6,389.41 would be deducted from North Star's rent for alleged excess downtime in November and December 2003. The Government calculated 26.5 excess downtime days in November 2003, and 39 excess downtime days for December, 2003. North Star's records do not support this calculation.

56. By letter dated February 12, 2004, North Star requested a COD on the propriety of the Government's deduction of $6,389.41 from North Star's rent based on the Government's calculation of November and December 2003 downtime, including the propriety of the Government's method of calculating the downtime amount.

57. By letter dated April 15, 2004, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on

the November and December 2003 Rent Abatement implicated the same allegations which are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

58. By letter dated February 20, 2004, the COR informed North Star that $4,898.98 would be deducted from North Star's rent for alleged excess downtime in January 2004. The Government calculated 48.5 excess downtime days in January 2004. North Star's records do not support this calculation.

59. By letter dated March 2, 2004, North Star requested a COD on the propriety of the Government's deduction of $4898.98 from North Star's rent based on the Government's calculation of January 2004 downtime, including the propriety of the Government's method of calculating the downtime amount.

60. By letter dated April 15, 2004, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the January 2004 Rent Abatement implicated the same allegations which are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

61. By letter dated March 26, 2004, the COR informed North Star that $4,895.05 would be deducted from North Star's rent for alleged excess downtime in February 2004. The Government calculated 47 excess downtime days in February 2004. North Star's records do not support this calculation.

62. By letter dated March 31, 2004, North Star requested a COD on the propriety of the Government's deduction of $4895.05 from North Star's rent based on the Government's

calculation of February 2004 downtime, including the propriety of the Government's method of calculating the downtime amount.

63. By letter dated April 15, 2004, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the February 2004 Rent Abatement implicated the same allegations which are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

64. In October, 2003, the Government reduced North Star's rent by $95,988.38. This reduction in a single month included rent deductions for multiple months, including May, August, October, and December 2002, as well as May and October 2003. As a result of the $95,988.38 reduction in the October, 2003 rent payment, North Star had insufficient funds to pay the escrow holder to meet its tax or insurance reserves.

65. By letter dated November 17, 2003, North Star requested a COD on the Government's actions of deducting multiple months' rent from a single months' rent payment. North Star also requested a decision on the Government's rent deductions, including the Government's method of calculating the deduction amount, and whether the implied duty of good faith and fair dealing permits the Government to deduct rent based on the terms of the Lease.

66. By letter dated January 5, 2004, the Government stated that it would be responding to North Star's request no later than February 9, 2004. By letter dated February 9, 2004, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on Rent Payments Withheld by the Government implicated the same allegations which are already pending before the Court of

Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

**III. The Government Continues to Wrongly Assess Downtime Against North Star**

67. The Housing Manager requested that North Star perform cleaning for units 1254, 1098, 806, and 619, and stated on work authorizations that North Star would be permitted a maximum of one and a half to three hours for cleaning and given one additional downtime day per unit.

68. The Government typically uses its own cleaning contractors to clean units. Upon information and belief, the Government gives its cleaning contractors other than North Star five (5) days to accomplish cleaning.

69. By letter dated December 9, 2003, North Star requested a contracting officer's decision on whether North Star would be given the amount of time to complete cleaning based on North Star's determination of the actual time cleaning would take.

70. By letter dated February 9, 2004, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the claim respecting Cleaning Downtime implicated the same allegations which are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

71. North Star completed all change of occupancy maintenance and repair work authorized by the Government for unit 807 and turned the unit back to the Government. Carpet replacement was not among this authorized work.

72. The Government and North Star then agreed that carpet replacement was required. The Government issued unit 807 back to North Star for the sole purpose of replacing the occupant damaged carpet.

73. The Government assessed seven (7) downtime days against North Star for replacing the occupant damaged carpet. The Birchwood Housing Manager has contended that the carpet was replaced during change of occupancy and was change of occupancy maintenance. However, replacement of occupant damaged carpet was not amount the items included in the maintenance or repair work authorized by the Government during change of occupancy.

74. On June 28, 2004, North Star requested a COD on the Government's charge to North Star for these additional seven downdays.

75. By letter dated July 22, 2004, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the Unit 801 Downtime Charge implicated the same allegations which are already pending before the Court of Federal Claims. By letter dated July 23, 2004, the contracting officer advised North Star that its letter should have referenced unit 807. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

**IV. The Government Continues To Misuse the Acceptance Inspection**

76. Section C.2(a) of the Lease requires the Government to conduct acceptance inspections "jointly with the Developer . . . at a time that is mutually agreeable." The Government has breached this provision of the Lease, conducting acceptance inspections on its own without notifying North Star.

77. The Government's failure to notify North Star of when acceptance inspections are taking place means that North Star is unable to correct deficiencies concurrently with the acceptance inspections. This causes additional downtime to accrue.

78. On April 12, 2004, North Star requested a COD on whether the Government is or is not required to provide North Star with notification of the time of the acceptance inspection, and whether if the Government changes the time of a scheduled acceptance inspection, it is or is not required to provide notice to North Star.

79. By letter dated May 24, 2004, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the Acceptance Inspections/Notification implicated the same allegations which are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

80. Deficiency lists generated by the Government's Quality Assurance ("QA") inspector at the acceptance inspection include items which are the occupant's responsibility, such as items designated "self help" items or items in need of repair due to occupant damage. North Star has been informed by the Contracting Officer and Birchwood Housing Manager that if it performs this work without the benefit of a work authorization, it will not be reimbursed. However, if it does not perform the work listed on the deficiency list, downtime continues to accrue.

81. On August 12, 2004, North Star requested a COD on whether or not the Government may include occupant/Government responsibility and self-help items on the deficiency list generated at the acceptance inspection and, if the Contracting Officer finds that

such items may be included, whether the Government must issue a work authorization and whether the time for correction can be used to assess downtime against North Star.

82. By letter dated May 24, 2004, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the Acceptance Inspections/Occupant and Government Responsibility Items implicated the same allegations which are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

83. After North Star returns units to the Government, the Government deliberately waits until the next half day to perform the initial acceptance inspection. This practice causes additional downtime to accrue. The Birchwood Housing Manager has attempted to justify this conduct on the basis that "they can."

84. After North Star performs corrections identified at the acceptance inspections, the Government deliberately waits until the next half day to examine North Star's corrections. This practice also causes additional downtime to accrue.

85. On April 12, 2004, North Star requested a COD on whether the Government can charge North Star with downtime days when North Star does not have the unit in its possession and control.

86. By letter dated May 24, 2004, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the Acceptance Inspections/ Non-Possession Charges implicated the same allegations which are already pending before the Court of Federal Claims. North Star deems the decision of the

contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

**V. The Contracting Officer's Representative Continues to Lack Independence**

87. The COR's authority originates with a June 13, 2000 memorandum from then-Contracting Officer Dennis Klein, expressly authorizing Mr. Everett to direct North Star "in cases where the contractor disputes whether such work is contractually required [hereinafter referred to as 'disputed work'] and the work is estimated to cost no more than ten thousand dollars ($10,000.00). The current contracting officer re-authorized this designation by memorandum dated March 26, 2002.

88. By contracting officer's decision dated December 8, 2003, the current contracting officer stated that the COR is to act as a "neutral arbiter of disputes" and should refrain from actions which "compromise his ability to provide independent assessments of disputed issues under the Lease.

89. On September 22 and 29, 2003, North Star received Maintenance Issue forms which had been signed by the COR, Rodney Everett, as the Government representative for the Government Housing Manager, Connie Kiser.

90. On October 10, 2003, North Star requested a COD as to Mr. Everett's ability to provide independent assessments of disputed issues under the Lease while also acting as a Housing representative.

91. On December 8, 2003, the contracting officer issued a decision that although Mr. Everett's actions created the appearance that his actions were inconsistent with his role as COR, his actions did not constitute a conflict of interest that would impact his dispute resolution duties.

The contracting officer directed, however, that Mr. Everett not perform the duties of the Housing Manager in the future.

92. Mr. Everett's actions indicate that he is pressured to uphold the actions of the Housing Manager, Ms. Kiser, and is limited in his ability to perform independent assessments of disputes. Indeed, he has upheld the actions of Ms. Kiser without performing, or being allowed to perform, any independent assessment, and has not contacted North Star for backup data.

93. On December 19, 2003, North Star requested a COD on Mr. Everett's independence.

94. On February 18, 2004, the contracting officer issued a decision that the COR had performed his duties appropriately, in a manner independent from interference or undue influence from the Housing Office staff.

## VI. The Government Continues to Deal with North Star in Bad Faith

95. Under the Lease, the standard for maintenance of Birchwood housing units is "pleasing appearance," which is defined by the Lease as "similar to the original finished appearance with only minor, nonobjectionable deterioration resulting from normal use." The Government, repeatedly and with the intention to harm North Star and diminish the value of is asset, continues to refuse to authorize work on the housing units necessary to conform to the contractual standard of maintenance.

96. North Star's records do not support the Government's monthly downtime calculations. North Star has repeatedly, in writing, asked the Government for documentation which would support the Government's monthly downtime calculations. The Government has never provided this requested documentation, and continues to reduce North Star's monthly rent payment which diminished the value of the North Star property.

97. The Lease of Birchwood Homes to the Government is for a term of nineteen-and-one-half (19.5) years, while the lease of the Government land to North Star is for a term of thirty-two (32) years. The Government is under a Court order in Case No. 98-168C to produce documents respecting a nexus or connection between the procedure for preparing CODs detailed in the July 24, 2002 memorandum of Lieutenant Colonel Meeks and the command interest in clarifying end of Lease options at the Birchwood site. By letter dated August 9, 2004 from Colonel Donna G. Boltz of the U.S. Army to North Star, the Government has now announced its intention to pursue the ultimate end of Lease option of not extending the Lease of Birchwood Homes, which will cause a further diminution in value as a result of the Government's intentional overt acts.

98. Upon information and belief, the Government is engaged in an intentional course of conduct designed to harm North Star and prevent North Star from challenging the way in which the Government administers the Lease. The Contracting Officer has repeatedly refused to issue Contracting Officer Decisions because he contended that to do so would implicate the same allegations in pending cases which had been stayed due to the Government's unfair and baseless criminal investigation.

**COUNT I**

**BREACH OF CONTRACT**

99. Paragraphs 1 through 98 above are incorporated by reference as if fully set forth herein.

100. The Government has engaged in multiple breaches of its Lease with North Star.

101. As a direct and proximate result of the Government's breaches, North Star has suffered damages in an amount to be determined at trial.

## COUNT II

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

102. Paragraphs 1 though 101 above are incorporated by reference as if fully set forth herein.

103. The Lease and other contract documents carry with them the obligation of the parties to conduct their affairs in good faith and to deal fairly with each other.

104. The Government's conduct under the Lease, set forth above, is in direct violation of its duty of good faith and fair dealing..

105. The Government's conduct represents an intentional course of conduct having as its principal intent the intentional infliction of injury to North Star, causing damages to North Star in an amount to be determined at trial.

## COUNT III

## DECLARATORY JUDGMENT

106. Paragraphs 1 though 105 above are incorporated by reference as if fully set forth herein.

107. There is a substantial controversy between the parties having adverse legal interests and/or sufficient immediacy to warrant issuance of a declaratory judgment.

108. Based upon the actions and inactions of the Government, North Star requests that this court find and declare that North Star's interpretations of the Contract, set forth above, are correct.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff respectfully demands judgment against defendant as follows:

(A) Damages in an amount to be determined at trial.

(B) A Declaration that plaintiff's interpretations of the Lease relative to this complaint are correct;

(C) Appropriate interest, attorneys' fees, and costs; and

(D) Such other and further relief as the court deems just and proper.

Dated: August 30, 2004

Respectfully Submitted,

PAUL W. KILLIAN
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Ave. N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Plaintiff's Complaint for Damages and Declaratory Relief was served first-class U.S. mail, postage pre-paid, and via hand delivery, this 30th day of August, 2004, on:

Donald E. Kinner, Esq.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Attorney for Defendant

Paul W. Killian