# APPENDIX
# PART 4

1060 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

August 16, 2002

Connie Kiser
801 Housing Manager, Birchwood
Public Works
Fort Wainwright

Subject: 1055 Downtime Days Calculation

Dear Ms. Kiser:

The Notification of Work Completion form for unit 1055, dated June 20, 2002, notes that the Government has assessed 34.5 downtime days for that unit. This calculation is clearly in error and appears to have been made in bad faith. Please immediately provide North Star with the back-up documentation you contend supports this calculation. Please also identify the contractual support for your inclusion of half-days in the downtime calculation for 1055.

Unit 1055 has been, and continues to be, the subject of multiple disputes between North Star and the Government. These disputes (which are discussed in detail in prior correspondence from North Star to the Government respecting the Government's administration of the Birchwood Lease) include the Government's issuing work authorizations that lack reimbursement amounts and conditioning reimbursement for occupant-damage upon receipt of subcontractor invoices; the Government's issuing work authorizations that do not accurately reflect the information noted on inspection forms; the Government's failure to distinguish between repair work and change of occupancy maintenance ("COM"); the authority of the Birchwood Housing Manager to order disputed work; and the use of the acceptance inspection to reject units for purported deficiencies that do not exist ("1055 Disputes").

The Government appears to have used the time associated with the 1055 Disputes – including the Government's own delay in responding to North Star's written requests for additional information respecting work to be performed – to improperly inflate the calculation of downtime for 1055 to 34.5 days. In fact, North Star's review of the timeline of events surrounding 1055 reveals that North Star spent a total of 1 day performing COM and 3 days performing repair work (i.e. major work such as carpet replacement) on that unit (as we informed you in previous correspondence, the Lease distinguishes between COM and repair work for purposes of calculating downtime). The timeline is as follows:

North Star Alaska Housing Corporation

A Fischer Properties Company

- April 29, 2002 – The pre-inspection of Unit 1055 reveals urine odor and detection on the carpet.

- April 30, 2002 – Government notifies North Star that unit 1055 will be turned over for change of occupancy maintenance ("COM") on June 10, 2002. North Star tells the Government the unit will be turned back to the Government on June 12, 2002.

- May 29, 2002 – The Final Inspection of 1055 notes urine detection in the living room, downstairs hall, upper hall, steps, and bedroom.

- June 5, 2002 – Government changes the turnover date to June 17, 2002, necessitating the rescheduling of carpet replacement by North Star.

- June 6, 2002 – North Star informs the Government that 1055 will be returned to the Government on June 19, 2002.

- June 17, 2002 – Government turns 1055 over to North Star for COM. The Government issues a work authorization form identifies only living room carpet replacement despite the fact that the inspection form notes pet stains on the upper hall, steps, and bedroom. The work authorization also requires an invoice from North Star as a condition for reimbursement – a change from prior practice. The Government also issues a Maintenance Issue form directing North Star to replace the vinyl in the upstairs hall bath. No problems with this vinyl existed which would necessitate replacement, nor were any such problems noted on the inspection form. North Star repairs the vinyl anyway.

- June 20, 2002 – North Star returns unit 1055 to the Government, with the living room carpet replaced, at 11:15 a.m. (Note that North Star performed 1 day of COM and one day of repair work).

- June 22, 2002 (Saturday) – North Star is sent a handwritten fax from the Government listing alleged deficiencies: (1) doorknobs have paint on them; (2) vinyl in bathroom needs replacement; and (3) the remote to the garage is missing. North Star is sent a second fax stating that carpet replacement is not complete, and the unit will be reissued for replacement at a later date.

- June 24, 2002 (Monday) – North Star receives the June 22 faxes and inspects the unit. North Star's inspection reveals no deficiencies – there is no paint on the doorknobs, the vinyl is not deficient, and the

remote is in a drawer (where the Government inspector typically places it after the final inspection).

- June 28, 2002 – North Star writes to the Government seeking answers to questions regarding reimbursement for work authorized repairs to 1055.

- July 1, 2002 – North Star receives a Deficiency Return Notification from the Government stating "the deficiencies had not been corrected so the unit is now officially being returned" and "insufficient carpet replacement which the unit will be re-issued for on July 8, 2002."

- July 2, 2002 – North Star requests that the Contracting Officer Representative ("COR") inspect the unit since North Star disputes the Deficiency Return Notification with respect to paint, vinyl, and the remote control. The COR does not find any deficiencies, but informs North Star it must replace it anyway if directed by the Birchwood Housing Manager. North Star sends a letter to the COR requesting his direction in writing. North Star also sends a letter to you stating that it returned the keys to the Government because no further work was required, and that it had requested direction from the COR to perform any further work. You responded to North Star by your letter of the same date, denouncing COR authority and stating that the unit is not in acceptable condition and downtime will continue while "deficiencies" remain. The Government issues another work authorization for the carpet replacement that was omitted from the initial June 17, 2002 work authorization.

- July 5, 2002 – North Star writes to the Government with questions and concerns regarding the July 2, 2002 work authorization form.

- July 8, 2002 – Unit 1055 is reissued to North Star, necessitating another carpet replacement rescheduling.

- July 9, 2002 – North Star returns to the unit to the Government after replacing the carpet on the stairs and in the bedroom and upstairs hall. (Note that North Star performed 2 days of repair work).

- July 10, 2002 – The Government accepts the unit, but continues to dispute the vinyl replacement issue. The Birchwood Housing Manager directs North Star to replace the vinyl. North Star writes to the Contracting Officer ("CO") regarding the contractual requirement that the COR order disputed work. This letter states that "as soon as we

have this direction and the dollar amount work authorized, we will give the Government a date as to which we will be returning to the unit and commence work directed."

- July 15, 2002 – North Star writes a letter to the Government regarding its failure to distinguish between COM and repair work.
- July 19, 2002 – North Star receives a response from the CO, dated July 3, 2002, regarding authority to order disputed work.
- July 22, 2002 – The Government provides North Star with a Notification of Work Completion for 1055, which notes a downtime calculation of 34.5 days.

The 34.5-day figure appears to include each day between June 17, 2002 and July 22, 2002, excepting one holiday. This calculation is obviously incorrect for this and other reasons as discussed above. Once again, please provide the back-up documentation you contend supports your downtime total for 1055. Finally, please be advised that the Government's past and present improper calculations of downtime days (and any associated rent abatement) will be the subject of a claim that North Star plans to submit to a CO in the near future.

Sincerely,

Eldon Wartes
Site Manager

cc: Harold Hopson
cc: Rod Everett

# NOTIFICATION OF WORK COMPLETION

DATE: 6/20/02
TIME: 11:15

FROM: DEVELOPER / CONTRACTOR
TO: HOUSING DIVISION ATTN: Ms Kiser

SUBJECT: Notification of work completion and unit availability.

1) This certifies that all required work at 1055 has been completed and the unit is ready for occupancy.

2) Completed work includes reimbursement work identified on work authorization # ____________ and dated ____________

Signature: [signature] NSAH rep.

Received by: Connie Kiser
Housing rep.

Date and Time: 22 July 02 (1300) (From CDC Tag)
(34.5 down days)
(Calculation of charges to follow)

1066 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 6000
Email fischerprop@seanet.com

7/02/02

Rod Everett
Contracting Officer Representative
Department of the Army
U S Army Eng. Dist. AK.
Fairbanks Residential Office
P O Box 35066
Ft Wainwright, AK 99703

Re: **1055 Sims**

Dear Mr. Everett,

As I mentioned to you this morning when we looked at unit 1055 Sims, I am waiting for direction from you as the designated Contracting Officer Representative with respect to issues pertaining to this unit.

I specifically require direction from you as to the upstairs hall bath vinyl replacement, the carpet and pad replacement on the steps, up hallway and bedroom 3, the paint on the doorknobs, and the garage door opener. We do not believe the vinyl needs replacement. The carpet replacement needs a dollar amount added. The doorknobs are fine, and the garage door opener is in its place.

If you direct North Star to do any of this work please advise us as to what dollar amount the Government is Work Authorizing for this work. As soon as we have this direction and the dollar amount Work Authorized we will give the Government a date as to when we will be returning the unit and commence work directed.

Sincerely,

Eldon Wartes
Site Manager
North Star Alaska Housing

North Star Alaska
Housing Corporatio

A
FISCHER
PROPERTIES

Fairbanks, Alaska 99703
Telephone 907 • 356 • 1615
Facsimile 907 • 356 • 1573
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2001
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

March 15, 2002

Col. David B. Snodgrass
Director of Public Works
730 Quartermaster Road
APVR-RTW
Ft Richardson, AK 99505-5000
(907)384-3000
fax (907)428-1186

Re: Your letter dated 2/28/02

Dear Col. Snodgrass,

The In formation you received from your subordinates as set forth in your letter dated February 28, 2002 was significantly incorrect. May I extend to you North Star Housing's sincere hope that we may develop a meaningful and productive working relationship. We would very much like to change what is clearly an advisory relationship practiced by certain of your subordinates. Mr. Fischer and I are available to meet with you at any mutually agreeable time to discuss the contents of your letter of February 28th 2002 and any other maters of dispute between our two organizations.

Let me now turn to the statements in your letter. First, to put things in perspective, overcharges referenced in the first paragraph totaled $135.00. The government deducted $45.00 from our Work Authorized Billing in November 2000. The overcharge was a mistake and we have refunded the $90.00.

Despite our prompt response to this discovery, a formal audit was initiated which we understand has resulted in a "formal copy of the audit report."[1] Your second and third paragraph states as follows:

> I have now received the formal copy of the audit report, which recommends that NSAHC replace the work authorizations missing from the Birchwood facility history files. The auditors are unable to complete their task until this quality control problem has been corrected.
>
> This situation, as you are aware, precludes the government from considering any performance award for NSAHC for 2001 (or for any part of 2002 for which it remains unresolved).

1 Please provide me with a copy of this report.

North Star Alaska Housing Corporation

A Fischer Properties Company

The facts of the matter are that the unit files in my office contain the work orders with descriptions of work and the government work authorization number on that work order. Every few years those work orders are removed from the files and a spreadsheet documenting each work order is added in their place. The actual government supplied work authorizations files are boxed by unit month and year in our shop. During the audit I explained all this to the government auditor, including showing him the boxes containing the actual work authorization files. I specifically asked him if he wanted me to get the files down for him. His response was "no, not at this time" I will ask my boss if he wants me to go through those and if so, I will come back up here next week to examine those work authorizations. He did come back the following week but spent little time here at our offices and did not mention or ask for the work authorizations. We have heard nothing further until your letter.

You also refer to Mr. Everett's letter of January 17, 2002 as directing North Star to "return the missing documents". That is incorrect. Mr. Everett's letter only asked us to devise a system to refer to work authorizations which, as described above, we have in place.

Your letter uses the above described "Quality Control problems" as justification for not considering any performance award for 2001. You may not be aware that, even if true (which it is not), this justification is untimely. The lease is clear that the award is to be determined no later than March 1st, and this letter was received on March 6th 2002. Thus, the excuse for no performance award is not only unjustified on the facts but is not timely.

North Star again offers to meet with you at a mutually convenient time in an attempt to set the framework of discussions and procedures which hopefully will negate comments and misunderstandings such as those set forth in your letter dated February 28th 2002.

Sincerely,

Eldon Wertes
Site Manager
North Star Alaska Housing

Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

May 24, 2002

Col. David B. Snodgrass
Director of Public Works
730 Quartermaster Road
APVR-RTW
Ft. Richardson, AK 99505-5000

Re: **Petersen's letter of 4/12/02**

Dear Col. Snodgrass:

This is in response to Mr. Peterson's letter to Mr. Fischer of April 12, 2002 received on or about April 23, 2002. a copy of which is attached.

First, your letter dated February 28, 2002 belatedly used "missing documents" as the reason for the government's failure to consider any performance awards for 2001 and, in part, 2002. My letter of March 15, 2002 corrected the misstatements of fact in your letter concerning "missing documents."

Simply stated, the documents were never missing. They were fully available to the auditors and, as I stated in my letter of March 15, 2002, the auditor stated that he did not want to see them. Further, as stated in my March 15, 2002 letter, we were simply requested to reorganize the existing documents, which has been done.

Despite these unrefuted facts, your Mr. Peterson again refers to "missing documents" and uses this as an excuse for the government's failure to complete its audit.

The government's action in this regards can only be perceived as being made in bad faith with the specific intent of diminishing the value of the Birchwood property.

Sincerely,

Eldon Wartes
Site Manager
North Star Alaska Housing

North Star Alaska Housing Corporation

A Fischer Properties Company

# North Star Alaska Housing Corporation

1056 7th Infantry Division Loop
Fort Wainwright, Alaska 99703
Telephone (907)356-1616
Fax (907)356-1575

## Memorandum

**Date:** June 26, 2002

**To:** **Harold Hopson (fax 907-753-1836)**

**From:** Richard W. Fischer

**RE:** **North Star Alaska Housing Officers** **2 pages total**

---

The following individuals are corporate officers of North Star Alaska Housing Corporation:

| | |
|---|---|
| President | Richard W. Fischer |
| Vice President | Dennis Wertz |
| Secretary/Treasurer | Rhonda R. Sekyra (please see attached corporate resolution) |

Mr. Eldon Wartes is the designated Site Manager for North Star Alaska Housing Corporation.

Richard W. Fischer, President

cc: Rodney Everett
cc: Connie Kiser

# NORTH STAR ALASKA HOUSING CORPORATION

## CONSENT IN LIEU OF
## ANNUAL MEETING OF DIRECTORS

The undersigned, being all the directors of North Star Alaska Housing Corporation, an Alaska corporation, hereby consent to the adoption of the following resolutions:

RESOLVED, that the following person is elected to serve as a officer of the corporation for a term expiring on death, resignation or removal from office, or the election of a successor: Treasurer, Rhonda Sekyra.

DATED at Seattle, Washington on December 17, 1996

Richard W. Fischer

.:24 pm

Birchwood Manor/North Star
Value Analysis

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | | Average |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | |
| North Star | 1,707.96 | (6.62) | (13.72) | (13.69) | 2.90 | (1.50) | | $ (6.52) |
| Polar Star | 1,100.38 | 12.79 | 11.68 | 19.52 | 31.33 | 23.17 | | $ 19.70 |
| **Difference** | | | | | | | Difference | $ 26.22 |
| **Total Expenses** | | | | | | | | |
| North Star | $ 518,082 | $ 519,769 | $ 641,250 | $ 554,119 | $ 725,742 | $ 1,242,053 | | |
| Polar Star | $ 503,982 | $ 509,428 | $ 501,207 | $ 502,638 | $ 509,360 | $ 714,498 | | |

| Deviation from Base Year | Base Year | | | | | | Total | Average | Units | Average/ Unit |
|---|---|---|---|---|---|---|---|---|---|---|
| North Star | $ 518,082 | $ 1,688 | $ 123,169 | $ 36,038 | $ 207,661 | $ 723,972 | $1,092,528 | $ 218,505 | 400 | $ 546.26 |
| Polar Star | $ 503,982 | $ 5,446 | $ (2,775) | $ (1,346) | $ 5,378 | $ 210,516 | $ 217,219 | $ 43,444 | 300 | $ 144.81 |
| Deviation Difference | | | | | | | $ 875,307 | | | $ 401.45 |
| Deviation difference times # of North Star units | | | | | | | | $ 175,061 | | $ 160,580 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Unit Expenses** | | | | | | | | |
| North Star | $ 1,295 | $ 1,299 | $ 1,603 | $ 1,385 | $ 1,814 | $ 3,105 | | |
| Polar Star | $ 1,680 | $ 1,698 | $ 1,671 | $ 1,675 | $ 1,698 | $ 2,382 | | |
| Deviation from Base Year | Base Year | | | | | | | |
| North Star | $ 1,295 | $ 4 | $ 308 | $ 90 | $ 519 | $ 1,810 | $ 2,731 | $ 546 |
| Polar Star | $ 1,680 | $ 18 | $ (9) | $ (4) | $ 18 | $ 702 | $ 724 | $ 145 |
| Difference | | $ (14) | $ 317 | $ 95 | $ 501 | $ 1,108 | $ 2,007 | $ 401 |
| ...difference times # of North Star units | | | | | | | | $ 160,580 |

| Capitalization Rate | Rate | Ak. Adjust | Total |
|---|---|---|---|
| Institutional | 10.00% | 1.00% | 11.00% |
| Non-Institutional | 12.00% | 1.00% | 13.00% |

Capitalization Rate
Band of Investment

| | | Ratio | Rate | Wt. Rate |
|---|---|---|---|---|
| Institutional | Equity | 30% | 15.00% | 4.50% |
| | Debt | 70% | 9.00% | 6.30% |
| | Total | | | 10.80% |
| Non-Inst. | Equity | 50% | 20.00% | 10.00% |
| | Debt | 50% | 10.00% | 5.00% |
| | Total | | | 15.00% |
| Difference | | | | 4.20% |
| | | Korpacz | | |
| Difference | | | | 1.03% |
| | | Scott + Dupree (Tentative) | | 2.00% |
| | | Forbes/Lehman | | |
| High Risk (Unrated) | | | | 11.25% |
| Low Risk (=/> BBB) | | | | 8.22% |
| Difference | | | | 3.03% |
| | | Moody/Treasury | | |
| Moody (Baa) | | | | 7.76% |
| 10 Year Treasury | | | | 4.51% |
| Difference | | | | 3.25% |

**VALUES**

Before/After Based on Expense& Cap Rate Differences

| | | Before Value | After Value | Difference |
|---|---|---|---|---|
| [1] | Effective Gross Income | $ 8,191,043 | $ 8,065,171 | |
| [2] | Operating Expenses | $ 1,081,473 | $ 1,242,053 | |
| | Net Operating Income | $ 7,109,570 | $ 6,823,118 | |
| | Rate | 11.00% | 13.00% | |
| | Value | $ 64,632,452 | $ 52,485,521 | |
| | Rounded | $ 64,632,000 | $ 52,486,000 | |
| | Difference | | | $ 12,146,000 |

[1] Re: revenue Anal. NSAH for before, Revenue difference (see below) for after.
[2] Before are actuals less deviation difference * 400 units,
After are actuals for 2001 from above

**Income and Expense Difference**

| | | |
|---|---|---|
| Five year expense deviation/unit | $ 2,007.25 | |
| Five year revenue deviation/unit | $ 26.22 | |
| Total expense difference | $ 2,033.47 | |
| Number of units | 400 | |
| Total expense difference | | $ 813,390 |

**Revenue Difference**

| | | |
|---|---|---|
| North Star Revenue/unit/month | $ 1,706.47 | [2001] |
| Valance in Revenue/Unit/Month | 26.22 | |

Q And isn't that sentence consistent to what you just told the Court, that it was your understanding that the units would be turned over to North Star as they became available from the tenants, and then cleaned by the government? Isn't that consistent with your previous testimony?

A Yes, sir.

Q Okay. And you see no reason, do you, sir, for the government to hold onto units as opposed to releasing them to North Star for change of occupancy as they are released by the previous tenant? You don't see any reason for the government to hold them, do you?

A I don't know what the reasons are. I understand that there have been some reasons for the government to delay issuance, or delay the pre-termination inspection or delay issuance of units after the occupants have moved out.

Q Okay, sir.

A But I don't know the specific reasons.

Q So you don't know any specific reasons?

A No, sir.

Q And you know, did you not, when you were the contracting officer that if the downtime was exceeded, that rent abatement damages could be assessed? Isn't

that true?
A Yes, sir.
Q Okay. And you knew they could add up to significant dollars, correct?
A Yes, sir.
Q And you knew as an individual who has been involved in real estate since 1985, that the way to value a commercial property is to look at a stream of income for that property and the expenses for that property; isn't that true?
A I'm not an appraiser, but I do realize that there is three approaches to most commercial appraisal and residential appraisal, commercial appraisal, I think.
Q Commercial. I mean, you realize that the way to appraise commercial property is to analyze a stream of income and the expenses for that property; isn't that true?
A That is one way; yes, sir.
Q Okay, and you knew this in 2002, correct?
A Yes, sir.
Q Now, sir, I would like you to keep the lease in front of you, if you would, and if you would look at Plaintiff's Exhibit 93. It's in the same book.
A Um-hmm.

Do you see that, sir?
A Yes.
Q Now, you never made an investigation or you didn't make an investigation at this time into the calculation of North Star's damages, did you?
A No.
Q And can you tell us what capitalization rate is, sir?
A I can tell you what I -- I think it has to do with the profit versus expense.
Q Did you direct anybody to do an investigation at this time into North Star's damages?
A No, sir.
Q Now, in February of 2002, the government began deducting monies from North Star's rent, did they not?
A Yes, sir.
Q And what for?
A For excessive downtime.
Q And you're a contracting officer. That must have been done under your direction, correct?
A Yes, sir. Not direction, but at least permission. I don't know what's the -- unless it was over $10,000.
Q But you're the man responsible?

A Right.

Q And you knew that was serious, did you not, sir, to offset an income flow on an investment property?

A Yes, sir. The whole lease is serious.

Q Pardon?

A The whole lease is serious.

Q Absolutely, and no argument there at all. But in terms of the action, when you're offsetting an income stream on an investment property, you knew as a man that's been in real estate since 1985 that was a very serious move, didn't you?

A Yes, sir.

Q And what investigation did you make personally as the contracting officer on this lease to determine whether or not the government's actions were correct or not correct?

A I talked to my contracting officer's representative, and asked him to check the calculations to make sure that these calculations are accurate.

Q But you never looked at them yourself, did you?

A No, sir.

Q And in February of 2002, this was the first

that North Star said they hadn't been receiving the backup? Is that the first time you were aware?

A I don't recall. I think it may have been.

Q Okay. Let me refer you to Exhibit K, sir. Exhibit K contains two letters. One is a letter from Mr. Everett to Mr. Wartes, and then there is a letter, a second letter, which is a letter to you dated May 30, 2002.

Do you see that?

A Yes.

Q And you received that letter, sir?

A Yes, I did.

Q And the second paragraph -- I'm sorry, the first paragraph talks about rent being deducted, correct?

A Yes, sir.

Q And the last paragraph of the letter talks about the seriousness of deducting rent because of the issue with respect to the rental stream which has serious financial implications to North Star.

Do you see that, sir?

A Yes, sir.

Q Okay. It talks about the actions will directly impact the capitalization rate for the project, which, in turn, serious impacts the value of

the North Star assets.

Do you see that?

A Yes, sir.

Q So you were put on specific notice that these actions were having serious financial impacts on North Star Alaska Housing at at least May 30, 2002, correct?

A Yes, sir.

Q And what did you do? As a contracting officer whose job is to be fair and equitable, what did you do when you received this letter on May 30, 2002?

A I don't recall specifically when I received this letter, but I do recall on several different occasions talking to my contracting officer to assure that they were not taking down days for any time between -- that the government was late in their inspection, the final inspection, and to also make sure that North Star was being given an opportunity to view the calculations.

Q And if they weren't being given an opportunity to review the calculations, you can't provide this Court with any good faith reason why they wouldn't be, can you?

A No, sir. As a matter of fact, I thought